APPENDIX

## THIRD-PARTY DEFENDANTS' RULE 56.1 STATEMENT OF MATERIAL FACTS AND THIRD-PARTY PLAINTIFF'S COUNTER-STATEMENT

### BACKGROUND

1. On the morning of August 31, 2013, Plaintiff Charles Vrazel ("Vrazel") was working as a ticket-selling employee of Long Island Rail Road Company ("LIRR") at Penn Station in New York City. (Ex. K (Wylie) at 44-45); Ex. H (Mendelson) at 17-21, 28-29; Ex. C at 304-307, 471-479.)

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

2. Vrazel was using a Ticket Office Machine ("TOM") belonging to LIRR that morning. (Ex. H (Mendelson) at 17-21, 28-29; Ex. C at 304-307, 471-479.)

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

3. The TOMs print and dispense the tickets required to use the LIRR's trains. (Declaration of Angelo Zuardo ("Zuardo Decl.") at ¶4).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT THE TOMS PRINT AND DISPENSE TICKETS FOR USE ON LIRR'S TRAINS.

4. LIRR's TOMs are numbered and Vrazel was using TOM No. 1243 on August 31, 2013. (Zuardo Decl. at ¶5; Ex. C at 304-307, 471-479).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

5. LIRR's TOMs were designed and manufactured by Scheidt & Bachman GmbH. (Zuardo Decl. at ¶6).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

6. Although the TOMs are housed in a metal cabinet that is easily movable because it is on casters, LIRR discouraged its ticket sellers from moving the TOMs in order to protect the TOMs' electrical plugs, and other plugs located behind the TOMs. (Ex. H (Mendelson) at 46; Ex. I (Dugan) at 44-48; Ex. D; Ex. F).

<u>LIRR's Counter-Statement</u>

THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT THE TOMS ARE HOUSED IN A METAL CABINET THAT ARE NOT EASILY MOVABLE. (Ex. I (Dugan) at 44-48).

7. Frequently, however, the ticket sellers moved the TOMs anyway, to retrieve objects fallen behind TOMs or for other reasons. (Ex. I (Dugan) at 44-48; Ex. J (Carter) at 22-24, 29).

   <u>LIRR's Counter-Statement</u>

   THIRD-PARTY PLAINTIFF DENIES. (Ex. I (Dugan) at 46-48).

8. The TOMs were also moved in order clean underneath and behind them. (Ex. I (Dugan) at 78-79).

   <u>LIRR's Counter-Statement</u>

   THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT LIRR EMPLOYEES WOULD SUPERVISE THE MOVING OF THE MACHINE FOR CLEANING STAFF TO KEEP THE AREA CLEAN OF DIRT AND DUST. (Ex. I (Dugan) at 77-79).

9. LIRR's employees were also known to dislodge the power cords behind the TOMs by accidentally kicking them or knocking them out of their outlets. (Ex. I (Dugan) at 61; Ex. J (Carter) at 23-27).

   <u>LIRR's Counter-Statement</u>

   THIRD PARTY PLAINTIFF ADMITS, EXCEPT THAT THERE WAS A PROCEDURE FOR A SUPERVISOR TO POWER DOWN THE MACHINE BEFORE REPLUGGING. (Ex. I (Dugan) at 61-62).

10. On August 31, 2013, the electrical power to TOM 1243 was supplied through an Uninterruptible Power Supply ("UPS") made by Eaton Corporation, not by Scheidt & Bachman. (Zuardo Decl. at ¶12; Declaration of Daniel Montoya ("Montoya Decl.") at ¶8).

    <u>LIRR's Counter-Statement</u>

    THIRD-PARTY PLAINTIFF DENIES. (Ex. I (Dugan) at 56-58).

11. In practical terms, that meant that TOM 1243 was plugged into the Eaton-made UPS, and the UPS was, in turn, plugged into a wall socket behind TOM 1243. (Zuardo Decl. at ¶12; Montoya Decl. at ¶8).

    <u>LIRR's Counter-Statement</u>

    THIRD-PARTY PLAINTIFF DENIES. (Ex. I (Dugan) at 56-58).

12. Six months previously, on February 25, 2013, Scheidt & Bachman had installed a new UPS to power TOM 1243. (Zuardo Decl. at ¶18; Montoya Decl. at ¶8).

    LIRR's Counter-Statement

    THIRD PARTY-PLAINTIFF ADMITS, EXCEPT THAT ON FEBRUARY 25, 2013, SCHEIDT & BACHMAN, USA CHANGED THE UPS AFTER CABLES OF THE BACK OF TOM 1243 WERE CLEANED. (LIRR Ex. D, (S & B service records at 2).

13. Scheidt & Bachman's technician found no problems with the UPS's three-prong plug when the UPS was attached to TOM 1243 on February 25, 2013. (Montoya Decl. at ¶10).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF DENIES. (Montoya Decl. At ¶10, 12).

14. If necessary, the UPS for a TOM could be replaced by an LIRR employee called a "Ticket Agent". (Ex. I (Dugan) at 53-56).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF DENIES. (Ex. K. (Wylie) at 11-12, 14).

15. The Eaton-made UPS attached to TOM 1243 on August 31, 2013, used a standard design three-prong plug that included a ground wire pin. The TOM's power cord that plugged into the Eaton-made UPS also used a standard design three-prong plug that included a ground wire pin. (Zuardo Decl. at ¶15; Montoya Decl. at ¶9).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF CAN NEITHER ADMIT NOR DENY BECAUSE THESE PARTS ARE NOT WITHIN THE POSSESSION OR CONTROL OF THE LIRR. (Ex. K. (Wylie) at 14-15).

16. The TOM was intended to be operated only when its power supply included a grounding wire. (Zuardo Decl. at ¶16).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

17. TOM 1243 was inspected by Scheidt & Bachman on June 10, 2013, and no problems with electrical shocks were detected by or reported to Scheidt & Bachman at that time. (Montoya Decl. at ¶¶11-13).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS THAT TOM #1243 WAS INSPECTED, EXCEPT THAT THE SCHEIDT & BACHMANN TECHNICIAN DID NOT

NOTICE IF THERE WERE ANY PROBLEMS. THIRD-PARTY PLAINTIFF CAN NEITHER ADMIT NOR DENY WHETHER NO PROBLEMS WITH ELECTRICAL SHOCKS WERE DETECTED WITHOUT ITS CHECKLIST OR WORK RECORDS OF JUNE 10, 2013).

### VRAZEL'S ACCIDENT AND THIS LITIGATION

18. On the morning of August 31, 2013, Vrazel discovered that TOM 1243 was giving him electrical shocks when he touched it. (Ex. J (Carter) at 11-16; Ex. K (Wylie) at 46-47; Ex. H (Mendelson) at 17-21, 28-29; Ex. C at 304-307, 471-479).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT VRAZEL REPORTED THAT TOM 1243 WAS GIVING HIM SHOCKS WHEN HE TOUCHED IT. (Ex. C, LIRR production) at 467, Ex. H (Mendelson) at 12-13).

19. Vrazel notified his supervisor, James Dugan, that TOM 1243 was giving him electrical shocks. (Ex. I (Dugan) at 19-21; Ex. J (Carter) at 18; Ex. C at 476-477). Rather than shutting down the malfunctioning machine, however, James Dugan initially directed Vrazel to continue working on TOM 1243. (Ex. I (Dugan) at 19-22).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT JAMES DUGAN DID NOT HAVE AUTHORITY TO SHUT DOWN THE MALFUNCTIONING MACHINE. (Ex. I (Dugan) at 34, 43-44)

20. James Dugan told Vrazel to keep working at TOM 1243 while he called management and began the process of alerting Scheidt & Bachman to a problem with TOM 1243. (Ex. I (Dugan) at 21-24; Ex. H (Mendelson) at 33; Ex. C at 477).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

21. The first time that LIRR was aware of TOM 1243 giving electrical shocks to its employees, or having any problems at all, was at the moment of Vrazel's injury on August 31, 2013. (Ex. H (Mendelson) at 30, 43-44; Ex. E at 1-2; Ex. K (Wylie) at 45).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT WHEN VRAZEL'S REPORTED THE PROBLEMS AND ALLEGED INJURY.

22. During LIRR's routine investigation of his accident, Vrazel admitted that receiving electrical shocks from TOM 1243 on August 31, 2013, was "an unusual or surprising incident" and that the first shock that day was "so out of the ordinary that he wasn't sure

if it was his TOM and if [it] would happen again." (Ex. H (Mendelson) at 39-40); Ex. C at 306).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

23. LIRR did not notify Scheidt & Bachman of the electrical shock problem with TOM 1243 until after Vrazel had been shocked on August 31, 2013. (Ex. C. at 476-477; Ex. I (Dugan) at 21-24; Ex. H (Mendelson) at 30, 43-44; Ex. E at 1; Ex. K (Wylie) at 45).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT IT COULD NOT NOTIFY SCHEIDT & BACHMANN OF THE ELECTRICAL SHOCK PROBLEM WITH TOM 1243 UNTIL NOTIFIED BY VRAZEL THAT HE HAD BEEN SHOCKED ON AUGUST 31, 2013.

24. Once LIRR notified Scheidt & Bachman of a problem with TOM 1243, Scheidt & Bachman dispatched a repair technician, who inspected TOM 1243 at approximately 2:30 PM on August 31, 2013. (Zuardo Decl. at ¶¶8-10).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

25. When Scheidt & Bachman's repair technician arrived, TOM 1243 had already been taken out of service. (Zuardo Decl. at ¶10).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

26. TOM 1243 remained out of service until September 1, 2013, when Scheidt & Bachman's repair technician identified the source of the problem as a broken grounding pin on the three-prong plug on the power cord running from the Eaton-made UPS to the wall socket. (Zuardo Decl. at ¶14; Ex. H (Mendelson) at 45).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT SCHEIDT & BACHMANN INCORRECTLY DIAGNOSED THE SOURCE OF THE ELECTRICAL PROBLEM ON AUGUST 31, 2013 AS COMING FROM THE MONEY DRAWER AND ADVISED AMTRAK ELECTRICIANS NEEDED TO INVESTIGATE. (LIRR Ex. D (S & B service records) at 7).

27. Scheidt & Bachman's repair technician fixed the problem by replacing the UPS unit. (Zuardo Decl. at ¶17).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF DENIES. (LIRR Ex. D (S & B service records at 8).

28. The most likely explanation for the broken grounding pin is that the UPS's plug broke because it had been kicked, pulled, or struck at an angle by an external force after it was installed in February 2013, and before Scheidt & Bachman's repair technician arrived on August 31, 2013. (Zuardo Decl. at ¶19).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF DENIES. (LIRR Ex. D (S & B service records) at 2, 8; Ex. K (Wylie) at 37-42).

29. LIRR admits that it had no idea why that grounding pin broke. (Ex. H (Mendelson) at 45). In fact, LIRR never even investigated what caused the grounding pin to break. (Ex. H (Mendelson) at 51-54).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF DENIES. (LIRR Ex. D (S & B service records at 8).

30. LIRR admits that TOM 1243 appeared to be "obviously defective" on August 31, 2013, because it was giving off electrical shocks and that "[i]f there was an electrical defect, [Vrazel] should not be working on the machine." (Ex. H (Mendelson) at 41-42).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF DENIES. (Ex. H (Mendelson at 41-42).

31. Nonetheless, Vrazel continued working at the TOM 1243 even after he was shocked. (Ex. H (Mendelson) at 33).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT VRAZEL CHOSE TO WORK AFTER RECEIVING THE INITIAL SHOCK ON TOM 1243. (Ex. H (Mendelson at 29-30).

32. Vrazel continued to receive electrical shocks from TOM 1243 and that, at approximately 11:00 AM on August 31, 2013, he received a shock that made him jerk his head back, causing a neck injury and tingling in his fingers. (Ex. H (Mendelson) at 21, 31-32; Ex. C at 306; 471; 476-477).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT VRAZEL REPORTED TO RICHARD MENDELSON THAT HE CONTINUED TO RECEIVE ELECTRICAL SHOCKS FROM TOM 1243 AND THAT, AT APPROXIMATELY 11:00 A.M. ON

AUGUST 31, 2013, HE RECEIVED A SHOCK THAT MADE HIM JERK HIS HEAD BACK, CAUSING A NECK INJURY AND TINGLING IN HIS FINGERS. (EX. H (MENDELSON) AT 21, 31-32; EX. C AT 306; 471; 476-477).

33. Vrazel was acting in the normal performance of his duties as an LIRR employee when he was injured.  (Ex. K (Wylie) at 44-45; Ex. C at 471-472).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS, EXCEPT THAT VRAZEL WAS ACTING IN THE NORMAL PERFORMANCE OF HIS DUTIES AS AN LIRR EMPLOYEE WHEN HE CLAIMED HE WAS INJURED.

34. Vrazel alleges that he has been severely injured as a result of the electrical shocks he received from TOM 1243 on August 31, 2013, and therefore sued LIRR in the present action.  (Ex. G (Complaint)).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

35. Although LIRR asserted as an affirmative defense the claim that Vrazel's injuries were caused solely by his own negligence and not by any negligence of LIRR's, LIRR has no facts to support that defense and does not know what factual basis it had when it filed its Answer.  (Ex. G; Ex. K (Wylie) at 27-28).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF DENIES. (Ex. C (LIRR Production) at 468-480).

36. LIRR served a Third-Party Complaint on Scheidt & Bachman GmbH and Scheidt & Bachman USA, Inc., alleging causes of action sounding in common-law indemnification, contribution, and contractual indemnification. (Ex. G (Third-Party Complaint)).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

37. Although the Third-Party Complaint alleged that "Third Party defendant SCHEIDT & BACHMANN, GmbH was negligent in the design and manufacture of its Ticket Operating Machine and in particular, TOM #1243", LIRR concedes that this is not true. (Ex. G; Ex. K (Wylie) at 30-31).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF DENIES.  (Ex. K. (Wylie) at 30-31).

38. LIRR is not aware of any problems with the design or manufacture of Scheidt & Bachman's TOMs in general or of TOM 1243 in particular. (Ex. K (Wylie) at 30-31).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF DENIES. (LIRR Ex. A. (Pl's Answer to Interrogatories) at 9; LIRR Ex. B (Pl's Answers to Third-Party Interrogatories) at 1-4).

39. Although the Third-Party Complaint alleges that "Third-party defendant, SCHElDT & BACHMANN, USA, INC., its agents, servants and employees, was negligent in its inspection, maintenance and repair of the TOM # 1243 that plaintiff was using at Penn Station at the time of his alleged injuries on August 31, 2013", this also lacks any factual support. (Ex. G; Ex. K (Wylie) at 31-32).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF DENIES. (Ex. C (LIRR production) at 468-480).

40. LIRR is not aware of anything that Scheidt & Bachman did incorrectly, at any time, in maintaining TOM 1243. (Ex. K (Wylie) at 32-33).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF DENIES. (Ex. C (LIRR production) at 476, 478, LIRR Ex. D (S & B service records).

41. LIRR is not aware of anything that Scheidt & Bachman did incorrectly, at any time, in repairing TOM 1243. (Ex. K (Wylie) at 32-33).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF DENIES. (Ex. C (LIRR production) at 476, 478, LIRR Ex. D (S & B service records).

42. LIRR is not aware of anything that Scheidt & Bachman did incorrectly, at any time, in inspecting TOM 1243. (Ex. K (Wylie) at 32-33).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF DENIES.

43. LIRR is not aware of any misconduct by Scheidt & Bachman that caused Vrazel's injury. (Ex. K (Wylie) at 32).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

44. The Third-Party Complaint alleged that there was a "joint service contract" to which Scheidt & Bachman and LIRR were parties "that contained terms for the contractor's liability for injury and damage providing that the Contractor shall be solely responsible for all injuries to all persons, including but not limited to, employees of the Contractor, it [sic] Subcontractors, and the Indemnified Parties." (Ex. G (Third Party Complaint) at ¶20).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

45. LIRR subsequently identified this "joint service contract" as "Contract #9284-Life Cycle Maintenance Services for MNR and LIRR's Ticket-Selling System," or "Contract 9284". (Ex. K (Wylie) at 33; Ex. E at 3).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

46. Despite LIRR's allegation in Paragraph 20 of the Third Party Complaint, LIRR is not aware of any term in Contract 9284 providing that Scheidt & Bachman would be solely responsible for all injuries to all persons. (Ex. K (Wylie) at 34).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

47. LIRR admits that it has never previously sought indemnification from Scheidt & Bachman for LIRR's liability to any person. (Ex. K (Wylie) at 34).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

48. The Third Party Complaint alleged that "Upon information and belief, the Contractor shall indemnify and save harmless the Indemnified Parties to the fullest extent permitted by law from loss and liability upon any and all claims and expense, including, but not limited to, reasonable attorneys' fees, on account of loss and liability for bodily injuries, irrespective of the actual cause of injury, irrespective of whether it shall have been due in part to negligence of the Contractor, its Subcontractors, the Indemnified Parties, or of any other person or entity." (Ex. G (Third Party Complaint) at ¶21).

    LIRR's Counter-Statement

    THIRD-PARTY PLAINTIFF ADMITS.

49. Despite LIRR's allegation in Paragraph 21 of the Third Party Complaint, LIRR is not aware of any such term in Contract 9284. (Ex. K (Wylie) at 35-36).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

50. The Third Party Complaint alleged that "Upon information and belief, defendant and third party plaintiff, is one of the "Indemnified Parties", as defined under Contract #9284 and SCHEIDT & BACHMANN, GmbH, and/or third-party defendant SCHEIDT & BACHMANN, USA, INC. are obligated to indemnify and save harmless defendant/third-party plaintiff from loss and liability upon plaintiff's claims for personal injuries, including reasonable attorneys' fees." (Ex. G (Third Party Complaint) at ¶24).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

51. Despite LIRR's allegation in Paragraph 24 of the Third Party Complaint, LIRR cannot say whether or not this allegation is true and does not know what information it might have been relying on when it filed the Third Party Complaint. (Ex. K (Wylie) at 36).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF DENIES. (See Ex. E (Certificate of Liability Insurance.).

52. Under Contract 9284, fingertip maintenance is not considered part of Scheidt & Bachman's work. (Ex. K (Wylie) at 50).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

53. Under Contract 9284, repair of parts and components damaged by reasons outside normal wear and tear is not considered part of Scheidt & Bachman's work. (Ex. K (Wylie) at 51).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

54. Under Contract 9284, remedial maintenance caused by external factors beyond the control of Scheidt & Bachman is considered "out of scope work" and therefore is not considered part of Scheidt & Bachman's work. (Ex. K (Wylie) at 51-52).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

55. Under Contract 9284, replacement or repair of components which have been damaged by factors beyond the control of Scheidt & Bachman is considered "out of scope work" and therefore is not considered part of Scheidt & Bachman's work. (Ex. K (Wylie) at 52).

LIRR's Counter-Statement

THIRD-PARTY PLAINTIFF ADMITS.

**ADDITIONAL DISPUTED FACTS ASSERTED BY THIRD-PARTY PLAINTIFF AND SCHEIDT & BACHMAN'S RESPONSE**

56. Plaintiff Vrazel alleged that prior to the accident of August 31, 2013 that he had experienced electrical problems with Tom #1243. (LIRR Ex. B. (Response to Third Party Interrogatories at 1-4; LIRR Ex. A (Response to Interrogatories at 7-11 )

    Scheidt & Bachman's Counter-Statement

    Admitted, except that Scheidt & Bachman notes that (1) LIRR has already admitted that it first received notice of electrical shocks from TOM 1243 on August 31, 2013; (2) Vrazel's Answers to LIRR's Interrogatories state that the electrical shocks experienced prior to his accident occurred on the same day as the accident; and (3) Vrazel's Answers to Scheidt & Bachman's Interrogatories state that he is unable to identify any specific dates prior to the accident on which electrical problems occurred. (Ex. H (Mendelson) at 30, 43-44; Ex. E at 1-2; Ex. K (Wylie) at 45); Undisputed Facts 21 & 22, *supra*; LIRR Ex. B at 1-4; LIRR Ex. A at 10).

57. The TOMS are on casters or wheels, but they are fairly heaving and only moved by LIRR ticket clerks with reasonable care under limited circumstances, such as to retrieve dropped coins or if there were problems with a plug or printer. (Ex. I (Dugan) at 44-48).

    Scheidt & Bachman's Counter-Statement

    Denied. (Ex. I (Dugan) at 78-79; Ex. J. (Carter) at 22-24).

58. LIRR Ticket Clerks would have a plastic shield against the selling windows to keep items from falling behind the machine. They generally tried to keep items from falling behind the TOMs. The fallen items could sometimes be retrieved without moving the TOMs. (Ex. I (Dugan) at 46-48).

    Scheidt & Bachman's Counter-Statement

    Admitted.

59. The LIRR was not sure what piece of equipment malfunctioned on August 31, 2013 and which end of the power cord was broken, whether it was the power cord on the wall or the part that does into the TOM machine. (Ex. H (Mendelson) at 44-45.

    Scheidt & Bachman's Counter-Statement

    Scheidt & Bachman admits that, at the outset of this lawsuit, LIRR was apparently unaware of which end of the power cord that plugged into the wall was broken, denies

that the LIRR was not sure which piece of equipment malfunctioned on August 31, 2013, and denies that Scheidt & Bachman is currently unaware as to which end of the UPS's power cord was broken on August 31, 2013. (Ex. H (Mendelson) at 45; Zuardo Decl. at ¶ 14; Undisputed Fact Nos. 26, 27, *supra*).

60. The S & B Technician, Angelo Zuardo, made a service call around 2:30 p.m. on August 31, 2013 after the LIRR reported that an employee stated had experienced shocks after touching the cabinet of TOM # 1243. He initially stated that it was an electrical problem to be addressed by AMTRAK. (Ex. C (LIRR production) at 476, 478; LIRR Ex. D (S & B service records ) at 7.

   Scheidt & Bachman's Counter-Statement

   Admitted.

61. S&B replaced a power cord and cable on TOM #1243 on September 1, 2013. (Ex. C (LIRR production) at 475; LIRR Ex. D (S & B service records) at 8.

   Scheidt & Bachman's Counter-Statement

   Denied, except admitted that Scheidt & Bachman's technician replaced the Eaton-made UPS connected to TOM 1243 on September 1, 2013, which had its own power cord. (Zuardo Decl. at ¶14, 17).