UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

CHARLES VRAZEL,

                    Plaintiff,

       -against-

LONG ISLAND RAILROAD COMPANY

                Defendant.

------------------------------------------------------------------x

LONG ISLAND RAILROAD COMPANY,

              Third Party Plaintiff,

       -against-

SCHEIDT & BACHMAN GMBH and SCHEIDT

& BACHMAN USA, INC.,

             Third Party Defendants.

------------------------------------------------------------------x

**FILED**
**CLERK**
11/8/2016 10:04 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**

**DECISION AND ORDER**

14-CV-6209 (ADS)(ARL)

**APPEARANCES:**

**Law Offices of Michael D. Flynn**
*Attorneys for the Plaintiff*
5 Penn Plaza
23rd Floor
New York, NY 10001
      By:    Valerie J. Lauriello, Esq., Of Counsel

**Karla R. Alston**
*Corporate Counsel for the Defendant and Third Party Plaintiff*
93–02 Sutphin Boulevard
Jamaica, NY 11435

**Sedgewick LLP**
*Attorneys for the Third Party Defendants*
225 Liberty Street
28th Floor
New York, NY 10281
      By:    William J. Brennan, Esq., Of Counsel

**SPATT, District Judge**:

This case arises from allegations by the Plaintiff Charles Vrazel (the "Plaintiff" or "Vrazel") that he suffered injuries because of the negligence of his employer, the Defendant Long Island Rail Road (the "Defendant," the "Third Party Plaintiff" or the "LIRR"), in violation of the Federal Employers' Liability Act, 45 U.S.C. § 51 (the "FELA"). The Defendant LIRR subsequently filed a third party complaint against the Third Party Defendants Scheidt & Bachman GmbH and Scheidt & Bachman USA, Inc. (collectively, the "Third Party Defendants" or "S&B"), alleging three causes of action sounding in contributory negligence, common law indemnification, and contractual indemnification.

Before the Court is a motion by S&B pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56 for summary judgment dismissing the third party complaint brought by the Defendant against S&B. For the reasons set forth below, the motion is denied in part and granted in part.

## I. BACKGROUND

### A. Procedural History

The Plaintiff filed a complaint against the Defendant on October 23, 2014. The complaint alleged a single cause of action under the FELA. The Defendant sought leave to join a third party into the action and the Court granted leave on May 2, 2015. On May 4, 2015, the Defendant, acting as the Third Party Plaintiff, served a complaint on S&B. The third party complaint (the "TPC") alleges three causes of action: common law indemnification, contributory negligence, and contractual indemnification.

S&B filed an answer to the TPC on June 25, 2015, and subsequently filed the instant motion for summary judgment against the Defendant on March 30, 2016. S&B attached eleven exhibits

in support of its motion: Notice of Deposition of Long Island Rail Road Company ("Exhibit ("Ex.") A"); the LIRR's response to the Third Party Defendants' first set of document requests ("Ex. B"); selected LIRR business records from their document production ("Ex. C"); a photograph of an LIRR work station ("Ex. D"); LIRR's amended response to the Third Party Defendant's first set of interrogatories ("Ex. E"); another photograph of an LIRR work station ("Ex. F"); LIRR's TPC ("Ex. G"); selected portions of the December 17, 2015 deposition of LIRR employee Richard Mendelson ("Ex. H"); selected portions of the December 17, 2015 deposition of LIRR employee James Dugan ("Ex. I"); selected portions of the December 17, 2015 deposition of LIRR employee Jeffrey Carter ("Ex. J"); and selected portions of the December 17, 2015 deposition of LIRR employee Kevin Wylie ("Ex. K"). S&B also submitted declarations from two of their technicians, Daniel Montoya ("Montoya"), and Angelo Zuardo ("Zuardo").

The Defendant responded on April 29, 2016 and attached several exhibits which are numbered in a somewhat confusing manner. The Court will refer to them in the following manner: the Plaintiff's response to the Defendant's Interrogatories ("Ex. 1"); the Plaintiff's medical records ("Ex. 2"); the Plaintiff's response to S&B's interrogatories and discovery demands ("Ex. 3"); LIRR Accident Report ("Ex. 4"); S&B's required disclosures ("Ex. 5"); several pages of S&B maintenance records ("Ex. 6"); and a certificate of liability insurance regarding contract 9284 ("Ex. 7").

## B. Factual Background

The following facts are drawn from the Defendant's admissions to S&B's 56.1 Statement of Material Facts ("SMF"), unless otherwise noted.

### 1. The Parties

The Defendant is a common carrier by railroad that engages in interstate commerce. (Compl. at ¶ 3). The Plaintiff was employed by the Defendant as a ticket seller during the relevant period. (SMF at ¶ 1). The Defendant has a joint-service contract with S&B, known as "Contract #9284–Life Cycle Maintenance Services for Metro North Railroad and LIRR's Ticket-Selling System" ("Contract 9284"). (SMF at ¶ 45; Ex. K at 33).

### 2. The LIRR Ticket Office Machines

Under contract 9284, S&B supplies and services LIRR Ticket Office Machines (TOMs), which are also designed and manufactured by S&B. (SMF at ¶ 5; Zuardo Decl. at ¶ 6). The TOMs print and dispense passenger train tickets. (SMF at 3). The LIRR TOMs are individually numbered. (*Id.* at ¶ 4). Each TOM is housed in a metal cabinet and is on wheels. (*Id.* at ¶ 6). Although the LIRR discourages its employees from moving the TOMs, employees sometimes move them. (*Id.* at ¶ 6–7). There seems to be some dispute as to how "easily" they are moved, but that does not bear on the issues before the Court. Because however difficult it is to move them, the record is clear that employees do move them. (Ex. J at 23–24; Ex. I at 79). They are moved to retrieve objects from underneath them or behind them, or to clean around them. (SMF at ¶ 8; Ex. I at 77–79). LIRR ticket clerks have plastic shields to prevent items from falling behind the machine. (SMF at ¶ 58; Ex. I at 46–48). The LIRR says that the fallen items could sometimes be retrieved without moving the TOMs. (Def's SMF at ¶ 58; Ex. I at 46–48).

Each TOM has an electrical power cord with a plug. (SMF at ¶ 9). The TOM is intended for use only when its power supply is grounded. (Zuardo Decl. at ¶ 16). Sometimes LIRR employees accidentally unplug the TOMs, or accidentally dislodge other plugs that are also behind the TOM. (SMF at ¶ 9; Ex. I at 61; Ex. J at 23–27). One reason employees are discouraged from

moving the TOMs is to protect the plugs behind the TOMs.  (SMF at ¶ 6; Ex. H at 46; Ex. I at 44–48; Ex. D; Ex. F).  When this occurs, employees are supposed to have a supervisor power down the TOM before plugging it back in.  (SMF at ¶ 9; Ex. I at 61–62).

### 3. The Alleged Incident

On August 31, 2013, the Plaintiff was using TOM 1243 at Penn Station in New York City, (SMF at ¶¶ 1, 4).  S&B states that TOM 1243 was plugged into an uninterruptible power supply ("UPS"), and the UPS was plugged into the wall socket.  (Zuardo Decl. at ¶ 2; Montoya Decl. at ¶ 8).  S&B asserts that the UPS is not made by them, but instead by Eaton Corporation.  (Zuardo Decl. at ¶ l2; Montoya Decl. at ¶ 8).  The Defendant states that it can neither admit nor deny whether or not the UPS and the TOM's plugs each had a three-prong plug that included a ground wire pin, both of which S&B asserts were present.  (S&B's SMF at ¶ 15).  The UPS for TOM 1243 had been previously replaced by S&B employee Montoya on February 25, 2013.  (SMF at ¶ 12; Montoya Decl. at ¶¶ 8, 10).  S&B states that Montoya did not notice any problems with the UPS.  (Montoya Decl. at ¶¶ 8, 10).  Montoya also inspected TOM 1243 on June 10, 2013, and changed the UPS after the cables behind TOM 1243 were cleaned.  (SMF at ¶¶ 12, 17; Montoya Decl. at ¶¶ 11–13).

The Plaintiff began receiving shocks from TOM 1243 shortly after he began using it on August 31, 2013.  (SMF at ¶ 18).  The Plaintiff notified his supervisor Dugan, and his supervisor told him to go back to work and continue using TOM 1243.  (SMF at ¶ 19; Ex. I at 19–22; Ex. J at 18; Ex. C at 476–477).  Dugan called management who began the process of notifying S&B.  (SMF at ¶ 20; Ex. I at 21–24; Ex. H at 33; Ex. C at 477).  The Defendant did not notify S&B of any problems with TOM 1243 until after the Plaintiff was shocked on August 31, 2013, and that

was the first time LIRR learned of any problems with TOM 1243.  (SMF at ¶¶ 21, 23; Ex. C at 476–77; Ex. I at 21–24; Ex. H at 30, 43–44; Ex. E at 1–2; Ex. K at 45).

The Plaintiff returned to working on TOM 1243, partly because the Plaintiff chose to continue working.  (SMF at ¶ 31; Ex. H at 33).  The Plaintiff said that the shocks were so unusual that he doubted that they would continue.  (SMF at ¶ 22; Ex. H at 39–40; Ex. C at 306).  At or about 11:00 A.M., the Plaintiff received a shock that tingled his fingers and jerked his head back, injuring his neck.  (SMF at ¶ 32; Ex. H at 21, 31–32; Ex. C at 306, 471, 476–77).  The Plaintiff alleges that he was severely injured as a result of the electrical shocks from TOM 1243 which he received while acting in the normal performance of his duties as an LIRR employee.  (SMF at ¶ 33; Ex. K at 44–45; Ex. C at 471–72).

Once informed of the issue, S&B sent their repair technician, Zuardo, who inspected TOM 1243 at or about 2:30 P.M. on August 31, 2013.  (SMF at ¶ 24; Zuardo Decl. at ¶¶ 8–10).  TOM 1243 had already been taken out of service.  (SMF at ¶ 29; Zuardo. Decl. at ¶ 10).  Zuardo initially believed that the electrical problem was caused by the money drawer and that Amtrak electricians needed to fix it.  (SMF at ¶ 60; Ex. C at 476, 478; Ex. 6 at 7).  TOM 1243 remained out of service until the next day, September 1, 2013, Zuardo fixed the problem.  (SMF at ¶ 26; Zuardo Decl. at ¶ 14).  The parties dispute whether it was the TOM itself that malfunctioned or the UPS unit.  (SMF at ¶ 27).  The parties dispute whether an LIRR ticket agent could have replaced the TOM UPS, (S&B's SMF at ¶ 14), but the Defendant's own witness said they have seen ticket agents replace UPS units.  (Ex. I at 54–55).

**4. What the Parties Did and What They Knew Before, During and After the Alleged Incident**

There is a dispute about what the parties did and what they knew before August 31, 2013, during August 31, 2013, and after August 31, 2013. Both parties agree that S&B inspected TOM 1243 on June 10, 2013, but they disagree as to whether S&B's technician noticed any problems or should have noticed any problems. (SMF at ¶ 17; Def.'s SMF at ¶ 39). The Defendant asserts that it is even a possibility that S&B was negligent in the design and manufacture of TOM 1243. (Def.'s SMF at ¶¶ 37, 38). The Defendant states that it did not learn of problems with TOM 1243 until August 31, 2013. (Def.'s SMF at ¶ 21). However, the Defendant admits that the Plaintiff alleges that he experienced electrical problems with TOM 1243 "prior to the accident of August 31, 2013". (SMF at 56). The Plaintiff himself said that "[o]n numerous occasions . . . there were shocks similar to static electricity. When the electrical shocks began, I reported them to supervision and was told they are normal, just keep working. This began to happen when the machine was older." (Ex. 3 at 2).

The Defendant says that it was not sure what piece of equipment malfunctioned on August 31, 2013 (the UPS or the TOM); which end of the power cord was broken; and whether it was the power cord on the wall or the part that goes into the TOM machine. (SMF at ¶ 59; Ex. H at 44–45). S&B claims that although it may be true that the Defendant did not know which end of the power cord plugged into the wall was broken, it did know which piece of equipment malfunctioned on August 31, 2013. (S&B's SMF at ¶ 26; S&B's Mem. of Law at 14, Zuardo Decl. at ¶ 14, SMF 26). S&B states that the UPS malfunctioned, and that it was the grounding pin in the UPS plug that was broken. (S&B's SMF at ¶ 26).

S&B claims that the Defendant admits that TOM 1243 was obviously defective on August 31, 2013 and that the Plaintiff should therefore not have been working at TOM 1243. (S&B's SMF at ¶ 30). S&B says the most likely explanation for the broken grounding pin is that some accident befell it between February 2013 and August 31, 2013. (S&B's SMF at ¶ 28). S&B further asserts that the Defendant admits that it does not know why the grounding pin broke and that the Defendant has never investigated why the grounding pin broke. (S&B's SMF at ¶ 29). Both parties admit that an S&B technician replaced a power cord that was either connected to TOM 1243 or its UPS on September 1, 2013. The Defendant claims that a power cord and cable on TOM 1243 were replaced. (SMF at ¶ 61). S&B claims a power cord on the UPS was replaced, and that its repairman fixed the problem from August 31, 2013 by replacing the UPS unit. (TPD Mem. of Law at 15; S&B's SMF at ¶ 17).

**5. The Contract**

The parties agree that Contract 9284 exists, but did not provide the contract for the Court. They agree that there is no term in the contract that says that S&B is *solely* responsible for all injuries to a person; (SMF at ¶ 44); and that the Defendant has never previously sought indemnification from S&B. (SMF at ¶ 47). The parties also agree that under Contract 9284, none of the following are considered part of S&B's work: fingertip maintenance (Ex. K at 50); repair of parts and components damaged by reasons outside normal wear and tear (Ex. K at 51); remedial maintenance caused by external factors beyond the control of S&B (Ex. K at 51–52); replacement or repair of components which have been damaged by factors beyond the control of S&B (Ex. K at 52).

They dispute whether the Defendant is an indemnified party as defined in Contract 9284 and whether therefore S&B must indemnify the Defendant. (SMF at ¶ 50).

## II. DISCUSSION

### A. The Standard of Review

Under FED. R. CIV. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"[A]t the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted)). In other words, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Barrows v. Seneca Foods Corp.,* 512 F. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole,* 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted). The Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 119 (2d Cir. 2012).

The movant has the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). If a nonmoving party fails to make a sufficient showing on an essential element of their case where they will have the burden of proof, then summary judgment is appropriate. *Id.* at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to

the motion for summary judgment is not met. *Liberty Lobby,* 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him. *See Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004).

## B. As to the Defendant's Contributory Negligence Claim

S&B argues that they are entitled to summary judgment because they do not owe LIRR a duty of reasonable care independent of their contractual obligations and because there is not any evidence that S&B was at fault in causing the Plaintiff's injury. (S&B's Mem. of Law at 17–18). The Court interprets the latter statement to mean that S&B did not breach any duties owed to the Plaintiff. The Defendant argues that there are questions of fact as to whether S&B was negligent. Here, the Court agrees with the Defendant.

Section 1401 of New York's Civil Practice Laws and Rules (the "CPLR"), New York's contribution statute, states that "two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought."

The right to contribution generally arises when "multiple wrongdoers . . . each owe a duty to plaintiff or to each other and by breaching their respective duties they contribute to plaintiff's ultimate injuries." *Trustees of Columbia Univ.,* 109 A.D.2d 449, 454, 492 N.Y.S.2d 371 (App. Div. 1st Dep't 1985). Thus, "[t]he critical requirement 'for apportionment by contribution under CPLR article 14 is that the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought.'" *Raquet v. Braun*, 90 N.Y.2d 177, 183, 659 N.Y.S.2d 237, 681 N.E.2d 404 (N.Y. 1997) (quoting *Nassau Roofing & Sheet Metal Co.*

*v. Facilities Dev. Corp.*, 71 N.Y.2d 599, 603, 528 N.Y.S.2d 516, 523 N.E.2d 803 (N.Y. 1988));

*Firestone v. Berrios*, 42 F. Supp. 3d 403, 421 (E.D.N.Y. 2013) (citing and quoting *Raquet*).

Therefore, the question is whether S&B owed either the Plaintiff a duty of reasonable care

or the LIRR a duty of reasonable care independent of the contract; whether they breached either

of those duties; and whether either breach had a part in causing the Plaintiff's injury.  The Court

finds that S&B owed the Plaintiff a duty of reasonable care; that a question of fact remains whether

S&B breached that duty and contributed to the Plaintiff's injury; and does not address the question

of whether S&B owed the Defendant a duty of reasonable care.

### 1.  As To Whether S&B owes the Plaintiff a Duty of Reasonable Care

It appears that S&B does not debate whether they owe a duty of reasonable care to the

Plaintiff.  (*See* S&B's Mem. of Law at 16–18).  Even if they had, the Court finds that S&B owe a

duty to the Plaintiff because they designed and manufactured the TOMs, *see Cacciola v. Selco*

*Balers*, Inc., 127 F. Supp. 2d 175, 185 (E.D.N.Y. 2001), and they inspect, maintain and repair the

TOMs.  *See Regalado v. Ecolab Inc.*, No. 14–CV–6020, 2016 WL 94139, at *4 (S.D.N.Y. Jan. 7,

2016) ("[T]he evidence is undisputed that Defendant owned the machine, serviced it monthly, was

solely responsible for its repair, and that one of Defendant's technicians inspected and attempted

to repair [it] . . . These undisputed facts, as a matter of law, give rise to a duty of care."); s*ee also*

*In re Sept. 11 Prop. Damage & Bus. Loss Litig.,* 468 F. Supp. 2d 508, 531 (S.D.N.Y. 2006) ("Those

who perform work, or deliver services or products, pursuant to a contractual or other commercial

relationship owe duties of care and proper performance to those entitled to receive the benefit of

their work or services or products.").

While "[t]he existence . . . of an alleged tortfeasor's duty is, in the first instance, a legal

question for determination by the court," *Di Ponzio v. Riordan,* 89 N.Y.2d 578, 583 (N.Y. 1997),

"[t]he scope of duty . . . depends on the [defendant's] relationship to . . . plaintiffs, whether plaintiffs were within a zone of foreseeable harm, and whether the harm was within the class of reasonably foreseeable hazards that the duty exists to prevent." *In re September 11 Litig.*, 280 F. Supp. 2d 279, 295 (S.D.N.Y. 2003). The Court finds that where S&B designed, manufactured, inspected, maintained, and repaired the TOMs, LIRR employees like the Plaintiff are within a zone of foreseeable harm when a TOM malfunctions. Regardless of whether S&B manufactures them, S&B also installs and replaces the UPS units. (*See* Montoya Decl. at ¶ 8). LIRR employees should reasonably expect that S&B should keep the TOM and UPS units in good repair. S&B should foresee that if they fail to keep the TOMs and UPS units in good repair, LIRR employees could be injured. Further, because the TOMs and UPS units are electrified, the harm here was within the class of reasonably foreseeable hazards that a duty of reasonable care is supposed to prevent. *See Almeciga v. Ctr. for Investigative Reporting, Inc.*, 121 F. Supp. 3d 379, 382–83 (S.D.N.Y. 2015) ("[C]ourts traditionally and as part of the common law process fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability.") (internal citations and quotations omitted).

Accordingly, the Court finds that S&B owed a duty of reasonable care to the Plaintiff.

### 2. As to Whether S&B Breached Its Duty of Reasonable Care to the Plaintiff

S&B argues that the Defendant has not presented any evidence to suggest that the Plantiff's injury was caused by any fault of S&B. The Defendant argues that a question of fact remains as to whether S&B contributed any fault. This boils down to questions of what exactly malfunctioned; when it started malfunctioning; and why. After a review of the record, the Court

agrees with the Defendant that questions of fact remain as to whether S&B breached their duty to the Plaintiff, and therefore whether they contributed to the Plaintiff's injuries.

As stated above, S&B designs and manufactures the TOMs. S&B supplies the TOMs to the LIRR; inspects the TOMs; maintains the TOMs; and repairs the TOMs. The record is not clear how often S&B is required to service the TOMs. S&B also installs and replaces UPS units for the TOMs.

It is undisputed that TOM 1243 shocked the Plaintiff and that either the TOM itself malfunctioned or the UPS attached to it malfunctioned. S&B states that it is clear that the UPS malfunctioned, not the TOM. This is not so. The Defendant disputes this and points to competent evidence in the record. The most important evidence is S&B's own service records from the next day, which indicate that the TOM malfunctioned: "The diagnosis found was the TOM power ground prong connector going to the UPS box was broken." (Ex. 6 at 8). The same service records also leave open which piece of equipment the S&B technician replaced. (*Id.* ("When replaced cable there is now no current coming from the TOM.")). S&B objects to this evidence because they claim it is inadmissible. This is without merit. These are the very same service records introduced by S&B's attorneys during the Wylie deposition as S&B 12. (Ex. K at 37–38). They questioned Wylie, an LIRR employee who was the LIRR's Fed R. Civ. P. 30(b)(6) designee for testimony about Contract 9284, TOM 1243 and the Third Party Complaint allegations, about the service records after laying a foundation. (*Id.* at 37–42). These documents were provided during discovery; S&B's own attorneys referenced them in depositions and questioned witnesses about them after the witnesses laid foundation; and they are provided to the Court by affidavit. (*See* Alston Aff. at 2).

The record is replete with questions of fact as to what malfunctioned on August 31, 2013. The LIRR's paperwork does not clarify which piece of equipment malfunctioned. Some of the LIRR paperwork includes reports and quotes from the S&B worker who inspected and repaired TOM 1243 after the incident, Angelo Zuardo. Zuardo's reports and quotes are similarly unclear about which piece of equipment malfunctioned. (*See* Ex. C at 307 (stating that "[Zuardo] replaced the 'power ground prong connector,'" with no mention of the UPS); *id.* at 475 (stating that the problem was a "[d]efective ground on power cord . . . Power cord replaced by Zuardo," and does not mention the UPS); *id.* at 477 (stating that Zuardo replaced the grounding pin on TOM 1243); *id.* at 478 ("He determined an electrical current was leaking from the TOM cabinet due to a faulty ground on the power cord," seemingly referring to the TOM). The fact that it was a grounding pin that malfunctioned similarly does not clarify which piece of equipment malfunctioned, because as S&B states, but the TOM and the UPS have a grounding pin. (S&B's SMF at ¶ 15). LIRR's witnesses were still unsure which piece of equipment malfunctioned when they were deposed. (Ex. H at 26 ("Yes, sir [I wrote that the electrical shock came from power cord to TOM 1243]); *id.* at 45 ("The way it was explained to me by the ticket clerk who talked to the Amtrak electricians, it was the prong, the ground fault prong on the cord, on the power cord [that plugged into the wall].").

But even assuming that the UPS malfunctioned, there would still be a question of fact as to S&B's breach. S&B installed the UPS, and they inspected it.

The alleged breach by S&B would be a question of fact because of the issue of when the shocks began. Although S&B asserts that the shocks began on August 31, 2013 (*See* S&B's Mem. of Law at 14 (stating that the only electrical shocks the Plaintiff experienced before his injuries happened on the same day as his injuries)), that is also untrue. The Plaintiff's interrogatories make

it clear that the shocks began some time before August 31, 2013. (Ex. 3 at 2 ("On numerous occasions, the dates of which are unknown, the TOM had electrical problems . . . On numerous occasions, the dates of which are unknown, there were shocks similar to static electricity. When the electric shocks began, I reported them . . . this began happening when the machine was older.")). The very fact that it is unclear when the shocks began makes it a question of fact as to who bears the fault for why the TOM and/or the UPS malfunctioned. An S&B technician inspected TOM 1243 less than two months before the Plaintiff suffered his alleged injuries. The record does not foreclose the possibility that the electric shocks started about that time.

Further, although S&B would like the Court to ignore it, the record is clear that on August 31, 2013, the S&B technician initially misdiagnosed the problem with TOM 1243. (Ex. C at 476 ("Zuardo said it was an electrical problem to be addressed by Amtrak"); Ex. 6 at 7 ("Found electrical shock is coming from money drawer not TOM, Amtrak electricians need to investigate.")). Not only does this raise a question of fact about what malfunctioned on August 31, 2013, but the misdiagnosis raises questions of fact about the sufficiency of S&B's earlier inspections. And if it is possible that S&B failed to properly inspect or maintain TOM 1243, there is a question of fact as to whether they breached a duty to the Plaintiff.

The record does not clarify when the shocks began, and it is also unclear what caused the malfunction. S&B believes that there is no question of fact there either—that "[t]he most likely explanation for the broken grounding pin is that . . . it had been kicked, pulled, or struck at an angle by an external force" between February 2013 and August 2013. (S&B's SMF at ¶ 28). However, this is disputed by the Defendant and the record illustrates that a question of fact remains as to what caused the malfunction. Since it is unclear when the shocks began, it is therefore unclear what caused the shocks. There are several possible explanations for why the TOM or the UPS

malfunctioned, and some of those explanations place S&B at fault, including the possibility that S&B was negligent in replacing the UPS or in repairing or inspecting the TOM.

S&B argues that because the Defendant was negligent or grossly negligent, S&B could not be negligent. As listed above, there is evidence in the record to raise a question of fact as to whether S&B was negligent. The fact that the Defendant was also possibly negligent does not preclude the possibility that S&B was also negligent, and would therefore be liable for negligence contributing to the occurrence. As discussed below, the fact that the Defendant was negligent bears upon the Defendant's claim for common law indemnification. However, it does not bear on its claim for common law contribution. *See Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 465 F. Supp. 790, 797 (S.D.N.Y. 1978) ("The court views this state of facts as the classic case where two parties have jointly contributed to a single injury. Any claim that [the plaintiff] may have against [the defendant] is one for contribution between joint tort-feasors . . . under New York law.")

Therefore, the Court finds that a question of fact remains as to whether S&B breached a duty of reasonable care to the Plaintiff.

### 3. As to Whether S&B's Possible Breach Contributed to the Plaintiff's Injuries

If S&B breached its duty to the Plaintiff, it did so by contributing to the equipment malfunction, which directly caused the Plaintiff's alleged injuries. Therefore, if S&B breached its duties to the Plaintiff, it would have contributed to his injuries as well. Because a question of fact remains about their breach, a question of fact also remains about their contribution to his injuries.

Therefore, the Court finds that a triable question of fact remains as to whether S&B is liable for negligence contributing to this occurrence, and accordingly denies that portion of its motion for summary judgment.

**C. As to the Defendant's Common Law Indemnification Claim**

S&B also claims that they cannot be held liable under a theory of common law indemnification because the LIRR was at least negligent if not grossly negligent. LIRR states that the record is rife with questions of fact as to why TOM 1243 malfunctioned, and that summary judgment is therefore inappropriate. Here, the Court agrees with S&B, because there is no question of fact that the Defendant was at least partially negligent, and therefore cannot seek indemnification under the common law of New York State.

The concepts of contribution and indemnification are similar. The main difference is that a party who seeks contribution is at least partially culpable for the underlying tort, and seeks to have the contributor pay for part of the total liability. *Tokio Marine & Fire Ins.*, 465 F. Supp. At 794 ("The party seeking indemnity attempts to shift the entire burden [to] another party on the ground that that other party is actually or primarily responsible for the tort."). The other difference is that the party seeking indemnification must not only show that the proposed indemnitor breached a duty to the original plaintiff, but that the proposed indemnitor also owes a duty to indemnify to the proposed indemnitee. *Highland Holdings & Zito I, L.P. v. Century/ML Cable Venture*, No. 06–CV–181, 2007 WL 2405689, at *4 (S.D.N.Y. Aug. 24, 2007), *aff'd sub nom. In re Century/ML Cable Venture*, 311 F. App'x 455 (2d Cir. 2009); *Ins. Co. of Pa. v. HSBC Bank USA*, 37 A.D.3d 251, 829 N.Y.S.2d 511, 518 (N.Y. 2007).

"The basic distinction between common law indemnification and contribution . . . is that 'a party who has itself participated to some degree in the wrongdoing cannot receive the benefit of the [common law indemnity] doctrine,' but only of contribution." *Durabla Mfg. Co. v. Goodyear Tire & Rubber Co.,* 992 F. Supp. 657, 660 (S.D.N.Y.1998) (quoting *Trustees of Columbia Univ. v. Mitchell/Giurgola Assocs.,* 109 A.D.2d 449, 453 (App. Div. 1st Dept. 1985)). "In other words,

contribution involves joint tortfeasors whereas indemnification involves vicarious liability." *Id.*; *see also Tokio Marine & Fire Ins.*, 2006 WL 3054321, at *3 ("In New York, "[a] party is entitled to [common law] indemnification when it is held liable for a tort committed by a third party despite the fact that it has done no wrong."); *McCarthy v. Turner Constr., Inc.,* 17 N.Y.3d 369, 377–78, 929 N.Y.S.2d 556, 563, 953 N.E.2d 794, 801 (N.Y. 2011) (holding that a party cannot obtain common law indemnification unless it proves that it was not negligent).

The Defendant cannot seek indemnification here because the Defendant was apparently also negligent and therefore at least partially responsible. The parties agree that on August 31, 2013, the Plaintiff notified his supervisor that TOM 1243 was giving him electrical shocks, and his supervisor initially directed Vrazel to continue to work on TOM 1243. (SMF at ¶ 19). It is well-settled that "[t]he doctrine of respondeat superior 'renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment.'" *Adorno v. Corr. Servs. Corp.*, 312 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (quoting *Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (N.Y. 1979)). The Defendant, as the Plaintiff's employer, has a duty of reasonable care to ensure that the Plaintiff did not get electrocuted. Because LIRR employees work with electrical equipment, this type of injury was foreseeable. The Plaintiff's injuries were especially foreseeable under these facts because the Plaintiff complained of being shocked before he was injured both on and before August 31, 2013. (*See* Ex. 3 at 2; SMF at ¶ 19). Therefore, under these circumstances, it can be assumed that the Defendant breached its duty of reasonable care when the Plaintiff's supervisor told him to go back to work on August 31, 2013. The breach directly contributed to the Plaintiff's injuries, because the Plaintiff was injured when he returned to work on TOM 1243.

Therefore, because under these assumed facts, the Defendant was at least apparently partially responsible for the Plaintiff's injuries, they cannot seek indemnification under the common law. *See Rock v. Reed-Prentice Division*, 39 N.Y.2d 34, 382 N.Y.S.2d 720, 722 (N.Y. 1976) ("[W]hen . . . the party seeking indemnification is himself partially at fault, the courts of this State, and throughout the Nation generally, refuse to imply a right to partial indemnification against another who played an effective role in causing the damage.") (internal citations and quotations omitted); *Martins v. Little 40 Worth Associates, Inc.*, 72 A.D.3d 483, 899 N.Y.S.2d 30 (App. Div. 1st Dep't 2010) (holding that common law indemnification requires proof that the party seeking indemnity was free from negligence); *Benedetto v. Carrera Realty Corp.*, 32 A.D.3d 874, 875, 822 N.Y.S.2d 542, 544 (N.Y. 2006) ("In order to establish their claim for common-law indemnification, the owners were required to prove [] [] that they were not negligent . . . "); *Buchwald v. Verizon New York, Inc.*, 52 A.D.3d 1301, 860 N.Y.S.2d 360 (App. Div. 4th Dep't 2008) ("A party is not entitled to common law indemnification unless that party establishes that it cannot be held responsible for the underlying injuries to any degree"); *see also Tokio Marine & Fire Ins.*, 465 F. Supp. at 797 ("The court views this state of facts as the classic case where two parties have jointly contributed to a single injury. Any claim that MDC may have against JAL is one for contribution between joint tort-feasors and not indemnity under New York law."); *Ins. Co. of N. Am. v. Historic Cohoes II*, 879 F. Supp. 222, 228 (N.D.N.Y. 1995) ("If the party seeking indemnity is held liable in part because of its own negligence, implied indemnification is unavailable and the only remedy is contribution").

Therefore, the Defendant may not seek common law indemnification from S&B because the Defendant itself is apparently at least partially liable, and accordingly, the Court grants S&B's motion for summary judgment as to that cause of action.

**D. As to the Defendant's Contractual Indemnification Claim**

S&B claims that they are entitled to summary judgment on the Defendant's contractual indemnification claim because the Defendant has not provided any evidence to support that it is entitled to contractual indemnification. The Defendant states that it is an indemnified party under Contract 9284 as well as under an insurance contract. Here, there is insufficient evidence before the Court to decide this issue, and the Court finds that summary judgment is improper at this juncture and denies that portion of S&B's motion.

Under New York law, contracts that allegedly indemnify a party for its own negligence are disfavored and are "carefully scrutinized … for an expression of an intent to indemnify and for some indication of the scope of that indemnification." *Williams v. J.P. Morgan & Co.*, 248 F. Supp. 2d 320, 325–26 (S.D.N.Y. 2003) (quoting *Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 321 N.Y.S.2d 81, 269 N.E.2d 799, 801 (N.Y. 1971)). The necessary intent to indemnify must be "expressed in unequivocal terms" and "unmistakable." *Id.*; *Haynes v. Kleinewefers*, 921 F.2d 453, 456 (2d Cir. 1990) (same); *In re Miller's Launch, Inc.*, 773 F. Supp. 2d 294, 296–97 (E.D.N.Y. 2011).

Here, there is a clear question of fact as to what the language in the contract says. Neither side agrees on what the contract says, and neither side has provided uncontroverted evidence, such as the contract itself. It is unclear whether there is an indemnification provision; who is indemnified if anyone; and, whether, unlike common law indemnification, partial indemnification is possible. *See Agric. Ins. Co. v. Ace Hardware Corp.*, No. 98–CV–8708, 2003 WL 164272, at *7 (S.D.N.Y. Jan. 17, 2003) (holding that an indemnification provision in a contract that called for partial indemnification was enforceable under New York law); *Buchwald v. Verizon New York, Inc.*, 52 A.D.3d 1301, 860 N.Y.S.2d 360 (App. Div. 4th Dep't 2008) (holding that third party

defendants were not entitled to summary judgment on property owner's cause of action for contractual indemnification, since it was not necessary that the property owner be found completely without fault in order to be partially indemnified under the contract).

S&B points to the deposition of Kevin Wylie, the Defendant's Rule 30(b)(6) designee for Contract 9284, in support of its proposition that there is no question of material fact about contractual indemnification. The Court disagrees. Wylie said that he was unaware of any provisions in contract 9284 that made S&B solely liable for any injuries. (Ex. K at 34). Most importantly, Wylie said that he did not know if the Defendant was an indemnified party as defined in Contract 9284. (*Id.* at 36). This does not show that the Defendant is clearly not an indemnified party as defined by Contract 9284; it shows that it is a question of fact as to whether the Defendant *is* an indemnified party under Contract 9284. Merely because Wylie said that he was unaware of any provision in Contract 9284 that held S&B solely liable does not disclose the possibility that there was a clause in Contract 9284 that held S&B partially liable.

There is ambiguity as to the terms of the contract, and the Court denies that portion of S&B's motion for summary judgment. *See Chock Full O'Nuts Corp. v. Tetley, Inc.,* 152 F.3d 202, 204 (2d Cir. 1998) (stating that "in a contract suit, summary judgment may be granted only where the language of the contract is unambiguous.") (internal citations and quotations omitted).

### III.  CONCLUSION

Based on the foregoing, S&B's motion for summary judgment pursuant to Fed. R. Civ. P. is granted in part and denied in part. It is granted to the extent that the Defendant's common law indemnification claim against it is dismissed with prejudice. It is denied to the extent that there are triable issues of fact regarding the Defendant's common law contribution claim and the Defendant's contractual indemnification claim.

It is **SO ORDERED:**

Dated: Central Islip, New York
       November 8, 2016

_____*/s/ Arthur D. Spatt*_____
ARTHUR D. SPATT
United States District Judge